# NO. 12-16-00281-CV

# IN THE COURT OF APPEALS

# TWELFTH COURT OF APPEALS DISTRICT

# TYLER, TEXAS

|  |  |  |
|---|---|---|
| *IN THE INTEREST OF Q.W., III,* | § | *APPEAL FROM THE* |
| *A CHILD* | § | *COUNTY COURT AT LAW* |
|  | § | *CHEROKEE COUNTY, TEXAS* |

## MEMORANDUM OPINION

L.G. appeals the termination of her parental rights. In four issues, she challenges the legal and factual sufficiency of the evidence to support the trial court's termination order. We affirm.

## BACKGROUND

L.G. is the mother of Q.W., III.[1] On September 3, 2015, the Department of Family and Protective Services (the Department) filed an original petition for protection of Q.W., III, for conservatorship, and for termination of L.G.'s parental rights. The Department was appointed temporary managing conservator of the child, and L.G. was appointed temporary possessory conservator with limited rights and duties to the child.

At the conclusion of the trial on the merits, the trial court found, by clear and convincing evidence, that L.G. had engaged in one or more of the acts or omissions necessary to support termination of her parental rights under subsections (E), (N), and (O) of Texas Family Code section 161.001(b)(1). The trial court also found that termination of the parent-child relationship between L.G. and Q.W., III was in the child's best interest. Based on these findings, the trial

---

[1] The trial court found, by clear and convincing evidence, that the father of the child, Q.W., II, had engaged in one or more of the acts or omissions necessary to support termination of his parental rights under subsections (N) and (O) of Texas Family Code Section 161.001(b)(1). The trial court also found that termination of the parent-child relationship between Q.W., II and Q.W., III was in the child's best interest. Based on these findings, the trial court ordered that the parent-child relationship between Q.W., II. and Q.W., III be terminated. The father is not a party to this appeal.

court ordered that the parent-child relationship between L.G. and Q.W., III be terminated. This appeal followed.

## TERMINATION OF PARENTAL RIGHTS

Involuntary termination of parental rights embodies fundamental constitutional rights. *Vela v. Marywood*, 17 S.W.3d 750, 759 (Tex. App.–Austin 2000), *pet. denied per curiam*, 53 S.W.3d 684 (Tex. 2001); *In re J.J.*, 911 S.W.2d 437, 439 (Tex. App.–Texarkana 1995, writ denied). Because a termination action "permanently sunders" the bonds between a parent and child, the proceedings must be strictly scrutinized. *Wiley v. Spratlan*, 543 S.W.2d 349, 352 (Tex. 1976); *In re Shaw*, 966 S.W.2d 174, 179 (Tex. App.–El Paso 1998, no pet.).

Section 161.001 of the family code permits a court to order termination of parental rights if two elements are established. TEX. FAM. CODE ANN. § 161.001 (West Supp. 2016); *In re J.M.T.*, 39 S.W.3d 234, 237 (Tex. App.–Waco 1999, no pet.). First, the parent must have engaged in any one of the acts or omissions itemized in the second subsection of the statute. TEX. FAM. CODE ANN. § 161.001(b)(1) (West Supp. 2016); *Green v. Tex. Dep't of Protective & Regulatory Servs.*, 25 S.W.3d 213, 219 (Tex. App.–El Paso 2000, no pet.); *In re J.M.T.*, 39 S.W.3d at 237. Second, termination must be in the best interest of the child. TEX. FAM. CODE ANN. § 161.001(b)(2) (West Supp. 2016); *In re J.M.T.*, 39 S.W.3d at 237. Both elements must be established by clear and convincing evidence, and proof of one element does not alleviate the petitioner's burden of proving the other. TEX. FAM. CODE ANN. § 161.001; *Wiley*, 543 S.W.2d at 351; *In re J.M.T.*, 39 S.W.3d at 237.

The clear and convincing standard for termination of parental rights is both constitutionally and statutorily mandated. TEX. FAM. CODE ANN. § 161.001; *In re J.J.*, 911 S.W.2d at 439. Clear and convincing evidence means "the measure or degree of proof that will produce in the mind of the trier of fact a firm belief or conviction as to the truth of the allegations sought to be established." TEX. FAM. CODE ANN. § 101.007 (West 2014). The burden of proof is upon the party seeking the deprivation of parental rights. *In re J.M.T.*, 39 S.W.3d at 240.

## STANDARD OF REVIEW

When confronted with both a legal and factual sufficiency challenge, an appellate court must first review the legal sufficiency of the evidence. *Glover v. Tex. Gen. Indem. Co.*, 619

2

S.W.2d 400, 401 (Tex. 1981); *In re M.D.S.*, 1 S.W.3d 190, 197 (Tex. App.–Amarillo 1999, no pet.). In conducting a legal sufficiency review, we must look at all the evidence in the light most favorable to the finding to determine whether a reasonable trier of fact could have formed a firm belief or conviction that its findings were true. *In re J.F.C.*, 96 S.W.3d 256, 266 (Tex. 2002). We must assume that the fact finder settled disputed facts in favor of its finding if a reasonable fact finder could do so and disregard all evidence that a reasonable fact finder could have disbelieved or found incredible. *Id*.

The appropriate standard for reviewing a factual sufficiency challenge to the termination findings is whether the evidence is such that a fact finder could reasonably form a firm belief or conviction about the truth of the petitioner's allegations. *In re C.H.*, 89 S.W.3d 17, 25 (Tex. 2002). In determining whether the fact finder has met this standard, an appellate court considers all the evidence in the record, both that in support of and contrary to the trial court's findings. *Id*. at 27-29. Further, an appellate court should consider whether disputed evidence is such that a reasonable fact finder could not have reconciled that disputed evidence in favor of its finding. *In re J.F.C.*, 96 S.W.3d at 266. The trier of fact is the exclusive judge of the credibility of the witnesses and the weight to be given their testimony. *Nordstrom v. Nordstrom*, 965 S.W.2d 575, 580 (Tex. App.–Houston [1st Dist.] 1997, pet. denied).

### TERMINATION UNDER SECTION 16.001(b)(1)(E)

In her first issue, L.G. contends the evidence is legally and factually insufficient to terminate her parental rights pursuant to subsection (E) of Texas Family Code section 161.001(b)(1).

### Applicable Law

The court may order termination of the parent-child relationship if it finds by clear and convincing evidence that the parent has engaged in conduct, or knowingly placed the child with persons who engaged in conduct, that endangers the physical or emotional well being of the child. TEX. FAM. CODE ANN. § 161.001(b)(1)(E) (West Supp. 2016). Scienter is not required for an appellant's own acts under section 161.001(b)(1)(E), although it is required when a parent places her child with others who engage in endangering acts. *In re U.P.*, 105 S.W.3d 222, 236 (Tex. App.—Houston [14th Dist.] 2003, pet. denied). The need for permanence is a paramount

3

consideration for the child's present and future physical and emotional needs. *In re N.K.*, 99 S.W.3d 295, 301 n.9 (Tex. App.—Texarkana 2003, no pet.); *In re M.D.S.*, 1 S.W.3d at 200.

"Endanger" means to expose to loss or injury or to jeopardize. *Tex. Dep't of Human Svcs. v. Boyd*, 727 S.W.2d 531, 533 (Tex. 1987); *In re D.M.*, 58 S.W.3d 801, 811 (Tex. App.— Fort Worth 2001, no pet.). It is not necessary that the conduct be directed at the child or that the child actually suffers injury. *Boyd*, 727 S.W.2d at 533; *In re J.J.*, 911 S.W.2d at 440. Subsection (E) requires us to look at the parent's conduct alone, including actions, omissions, or the parent's failure to act. *In re D.J.*, 100 S.W.3d 658, 662 (Tex. App.—Dallas 2003, pet. denied); *In re D.M.*, 58 S.W.3d at 811. Termination under subsection (E) must be based on more than a single act or omission. *In re D.M.*, 58 S.W.3d at 812; *In re D.T.*, 34 S.W.3d 625, 634 (Tex. App.—Fort Worth 2000, pet. denied). A voluntary, deliberate, and conscious "course of conduct" by the parent that endangers the child's physical and emotional well being is required. *In re D.M.*, 58 S.W.3d at 812; *In re D.T.*, 34 S.W.3d at 634.

A parent's use of narcotics and its effect on her ability to parent may qualify as an endangering course of conduct. *In re J.O.A.*, 283 S.W.3d 336, 345 (Tex. 2009); *see also In re R.W.*, 129 S.W.3d 732, 739 (Tex. App.—Fort Worth 2004, pet. denied). A parent's repeated engagement in illegal drug activity or repeated association with known criminals, after agreeing not to do so in a service plan for reunification with her child, may be considered in an analysis of whether clear and convincing proof exists of voluntary, deliberate, and conscious conduct that endangered the well being of her child. *See In re T.N.*, 180 S.W.3d 376, 383 (Tex. App.— Amarillo 2005, no pet.).

As a general rule, conduct that subjects a child to a life of uncertainty and instability endangers the physical and emotional well being of a child. *In re M.R.J.M.*, 280 S.W.3d 494, 503 (Tex. App.—Fort Worth 2009, no pet.); *In re R.W.*, 129 S.W.3d at 739. Evidence of criminal conduct, convictions, and imprisonment and its effect on a parent's life and ability to parent may establish an endangering course of conduct. *In re S.M.*, 389 S.W.3d 483, 492 (Tex. App.—El Paso 2012, no pet.). Imprisonment alone does not constitute an endangering course of conduct, but it is a fact properly considered on the endangerment issue. *Id.* (citing *Boyd*, 727 S.W.2d at 533-34). Moreover, a parent's failure to visit their child regularly during the pendency of the case supports a finding of endangerment of the child's emotional well-being. *See In re*

4

***S.I.H.***, No. 02-11-00489-CV, 2012 WL 858643, at *6 (Tex. App.—Fort Worth Mar. 15, 2012, no pet.) (mem. op.).

If a parent abuses or neglects the other parent or another child, that conduct can be used to support a finding of endangerment even against a child who was not yet born at the time of the conduct. ***In re C.J.F.***, 134 S.W.3d 343, 351 (Tex. App.—Amarillo 2003, pet. denied). Endangering conduct is not limited to actions directed towards the child. ***Boyd***, 727 S.W.2d at 533. It necessarily follows that the endangering conduct may include the parent's actions before the child's birth and while the parent had custody of older children, including evidence of drug usage. *See **id.*** (stating that although endanger means more than a threat of metaphysical injury or the possible ill effects of a less-than-ideal family environment, it is not necessary that the parent's conduct be directed at the child or that the child actually suffers injury); *see also **In re M.N.G.***, 147 S.W.3d 521, 536 (Tex. App.—Fort Worth 2004, pet. denied) (holding that courts may look to parental conduct both before and after child's birth to determine whether termination is appropriate).

## Analysis

When L.G. gave birth to Q.W., III in the summer of 2015, she tested negative for drugs at the hospital, and Q.W., III was born healthy. Michael Roberts, a Department investigator, reviewed L.G.'s lengthy Department history involving three older children and contacted her at the hospital. Because L.G. tested negative at the hospital and had an appropriate home, she was allowed to be discharged from the hospital with the baby. However, two weeks later, L.G. tested positive for cocaine. Roberts stated that L.G. denied any drug use, saying that she had not used drugs in three years. According to L.G., it was "their word against [hers.]" Laurie Beaman, a Department investigator, testified that L.G. believed "strongly" that she had no drug issues. She said that L.G. continued to deny that the drug test was positive. Q.W., III was removed and eventually placed in foster care.

Regarding L.G.'s drug use, testimony at trial showed that L.G. was asked to submit to drug testing approximately once every month. Micah Goss, a Department caseworker, testified that L.G. missed a hair follicle drug test on May 25, 2016, and a requested drug test on June 30, 2016. L.G. testified that she was unable to provide a hair follicle because of her hair extensions. She admitted that she was told not to alter her hair during the course of the Department's case.

5

However, she said, if the choice was testing clean for her child or having pretty hair, she chose pretty hair. According to L.G., she missed the June 30, 2016, drug test because she had to work.

L.G. had an extensive criminal record. She was arrested twice for burglary of a habitation in 2009 and 2010. In 2011, L.G. was convicted of assault causing bodily injury of a family member, the father of her two older children. She was charged with possession of prohibited substance in a corrective facility in 2011, and sentenced to five years of deferred adjudication community supervision. According to L.G., she was arrested for failing to appear on the 2011 assault charge. She stated that during a body search, officers discovered crack cocaine in her hair. She admitted that she had been on her way to sell the drugs before being arrested. At the time of trial, L.G. had also been charged with Medicaid fraud, a federal offense. She believed she was facing five years of federal probation if convicted.

L.G. also had a history of relationships with men involved in criminal activity. The father of her two oldest children had a criminal history, as did the father of her third child. L.G. was also aware that Q.W., III's father, Q.W., II, had a criminal history, including convictions for making a terroristic threat and assault causing bodily injury. However, L.G. testified that she was not aware of Q.W., II's convictions for possession of a controlled substance, a state jail felony; unlawful restraint, a felony; and burglary of a building, a state jail felony. She also knew that the man with whom she had a relationship during this case had a criminal history, including an assault charge.

Additionally, the testimony showed that L.G. missed at least half of her scheduled weekly visitations with Q.W., III. Goss characterized L.G.'s attendance as very "sporadic," even after she worked to accommodate L.G.'s work schedule and offered her transportation. Beaman stated that L.G. did not visit Q.W., III "even close to regularly," and characterized it as "leaving your child." She also stated that it was "absolutely critical" that a parent take every opportunity to spend time with their infant child in order to bond with them.

According to L.G., she missed some visitations with Q.W., III because of work and transportation issues. She explained that the Department asked her to obtain full-time employment and her employer refused to work around the Department's schedule. Beaman testified that the Department would accommodate parents, and would schedule visitations after hours or on weekends. Nonetheless, L.G. never asked the Department to reschedule her visitations and never responded to Goss's offers of transportation.

Finally, L.G.'s three older children were removed from her care, she voluntarily relinquished her parental rights to all three children, and they were eventually adopted. The testimony at trial showed that the two older children were removed because the Department found there was reason to believe that she neglectfully supervised them. The Department's report showed allegations that the children had thrush and were underweight. L.G. admitted that she was using cocaine during the Department's case involving these children and tested positive for drugs.

L.G.'s third child was born with her organs outside of her body, and tested positive for marijuana and benzos. At that time, the conservatorship case involving L.G.'s two older children was ongoing. L.G. denied using drugs during her pregnancy and told Beaman that it was not true that the third child tested positive for drugs. The Department found reason to believe that L.G. physically abused the child, and removed the child from her custody. According to Beaman, the third child was critically ill, but survived "by a flat miracle."

## Conclusion

From this evidence, a reasonable fact finder could have determined that L.G. tested positive for drugs shortly after giving birth to Q.W., III, did not submit to all requested drug tests, had a history of drug issues during the Department's investigations with her older children, had a lengthy criminal history, and associated with men who had lengthy criminal histories. *See* TEX. FAM. CODE ANN. § 161.001(b)(1)(E). The fact finder could have also formed a firm belief or conviction that she "sporadic[ally]" visited Q.W., III, had three other children removed from her care for neglect and abuse, and relinquished her parental rights to three older children. *See id.* Therefore, we hold that the evidence, viewed in the light most favorable to the finding, was sufficiently clear and convincing that a reasonable trier of fact could have formed a firm belief or conviction that L.G. engaged in conduct, or knowingly placed the child with persons who engaged in conduct, that endangered the physical or emotional well being of the children. *See In re J.F.C.*, 96 S.W.3d at 266.

Although there is conflicting evidence that L.G. may have been unable to schedule visitations around her work, a reasonable fact finder could have resolved these conflicts in favor of its finding. *See* TEX. FAM. CODE ANN. § 161.001(b)(1)(E). While there is some disputed evidence, this evidence is not so significant that a reasonable trier of fact could not have reconciled this evidence in favor of its finding and formed a firm belief or conviction that L.G.

engaged in conduct, or knowingly placed the child with persons who engaged in conduct, that endangered the physical or emotional well being of the children. *See In re C.H.*, 89 S.W.3d at 25.

Therefore, we hold that the evidence is legally and factually sufficient to support termination of L.G.'s parental rights under section 161.001(b)(1)(E). Accordingly, we overrule L.G.'s first issue.[2]

## BEST INTEREST OF THE CHILDREN

In her fourth issue, L.G. contends the evidence is legally and factually insufficient to support a finding that termination of her parental rights is in the child's best interest. In determining the best interest of the child, a number of factors have been considered, including (1) the desires of the child; (2) the emotional and physical needs of the child now and in the future; (3) the emotional and physical danger to the child now and in the future; (4) the parental abilities of the individuals seeking custody; (5) the programs available to assist these individuals; (6) the plans for the child by these individuals; (7) the stability of the home; (8) the acts or omissions of the parent that may indicate the existing parent-child relationship is not a proper one; and (9) any excuse for the acts or omissions of the parent. *Holley v. Adams*, 544 S.W.2d 367, 371-72 (Tex. 1976).

The family code also provides a list of factors that we will consider in conjunction with the above-mentioned *Holley* factors. *See* TEX. FAM. CODE ANN. § 263.307(b) (West Supp. 2016). These include (1) the child's age and physical and mental vulnerabilities; (2) the magnitude, frequency, and circumstances of the harm to the child; (3) the results of psychiatric, psychological, or developmental evaluations of the child, the child's parents, other family members, or others who have access to the child's home; (4) whether there is a history of substance abuse by the child's family or others who have access to the child's home; (5) the willingness and ability of the child's family to seek out, accept, and complete counseling services and to cooperate with and facilitate an appropriate agency's close supervision; (6) the willingness and ability of the child's family to effect positive environmental and personal

---

[2] Because we have concluded that the evidence is legally and factually sufficient to support termination of L.G.'s parental rights under subsection (b)(1)(E), we need not address her second and third issues regarding subsections (b)(1)(O) and (b)(1)(N). *See* TEX. FAM. CODE ANN. § 161.001(b)(1); TEX. R. APP. P. 47.1.

8

changes within a reasonable period of time; (7) whether the child's family demonstrates adequate parenting skills; and (8) whether an adequate social support system consisting of an extended family and friends is available to the child. *See id.* § 263.307(b)(1), (3), (6), (8), (10), (11), (12), (13).

The evidence need not prove all statutory or *Holley* factors in order to show that termination of parental rights is in a child's best interest. *See Holley*, 544 S.W.2d at 372; *In re J.I.T.P.*, 99 S.W.3d 841, 848 (Tex. App.—Houston [14th Dist.] 2003, no pet.). In other words, the best interest of the child does not require proof of any unique set of factors nor limit proof to any specific factors. *In re D.M.*, 58 S.W.3d at 814. Undisputed evidence of just one factor may be sufficient in a particular case to support a finding that termination is in the child's best interest. *In re M.R.J.M.*, 280 S.W.3d at 507. But the presence of scant evidence relevant to each factor will not support such a finding. *Id.* Evidence supporting termination of parental rights is also probative in determining whether termination is in the best interest of the child. *See In re C.H.*, 89 S.W.3d at 28-29. We apply the statutory and *Holley* factors below.

**Analysis**

The evidence discussed above shows that L.G. had a long history of drug use, failed to submit to requested drug testing, failed to visit Q.W., III, and had a long history of associating with criminals. She also had an extensive Department history and criminal history.

The testimony at trial showed that in the past, L.G. failed to complete or work her service plans regarding her three older children. Beaman stated that she detected a pattern with L.G. and the service plans. Specifically, L.G. did not work her services, blamed the Department for not helping her, blamed her lack of transportation for her inability to comply, and denied drug use. In this case, L.G. also failed to complete her service plan. She testified that she was unable to attend Narcotics Anonymous classes because she worked the night shift and was unaware that classes were offered day and night. She admitted that she did not attend sessions even when she was out of work because she lacked transportation. Nor did L.G. complete counseling because of her transportation issues. She was scheduled to attend counseling twice a month, but usually attended once a month, if at all.

According to Goss, L.G. completed a psychological evaluation but did not follow the recommendations. The recommendations included consulting with a skilled physician to ascertain the benefits from medication; satisfactorily completing counseling to address issues

regarding anxiety, anger, and irritability; completing parenting classes; establishing and maintaining employment to support herself and her children; and establishing and maintaining a sanitary, safe, drug-free, and stable home for herself and her children. Goss also noted that the screening tool for the detection of physical child abuse on L.G.'s evaluation stated that the resulting abuse scale score exceeded clinical cut-off levels, indicating that L.G. demonstrated characteristics of known physical child abusers and was "at risk."

Regarding L.G.'s relationship with Q.W., III, she had visitations with him at a relative's house before he was moved to foster care. The relative reported to Goss that L.G. did not show much interest in the baby, and spent the majority of her visits on the porch, talking on a telephone, and smoking cigarettes. She also insisted that her current boyfriend accompany her on those visits. After Q.W., III was moved to foster care, Goss observed visitations between L.G. and the baby. She stated that L.G. behaved appropriately, but lacked knowledge of child development. L.G. wanted him to sit up and play when he was too young to do so, and swaddle him when he wanted to take his bottle himself while he was "playing and running around." Goss stated that L.G. never brought Q.W., III presents even though she provided a car seat and some clothing during one visit. She never provided any type of financial support for the baby's caregivers.

At the time of trial, L.G. was unemployed. During the case, she worked for two different employers. L.G. said that she quit her first job because she was not making enough money to take care of herself or her child, and provide a home. She stated that she quit her second job because she missed too many visitations. L.G. stated that she was out of work for approximately a month and a half before returning to the first job. However, she admitted quitting that job two weeks before trial because she injured her hand. She testified that she was looking for work, but had recently refused employment because it was "just not that much pay."

Regarding Q.W., III, Goss testified that at the time of trial, he was pulling up, standing, crawling, and taking a few steps. She stated that he appeared to be very happy in his foster home and very bonded to his foster father. The CASA volunteer described Q.W., III as "blossoming," developing normally, and appearing to be happy and healthy. She noted the "wonderful interaction" between the foster father and Q.W., III. The foster father testified that Q.W., III was at the "toddling" stage and fit in with their family. He stated that they hoped to provide Q.W., III with a safe loving home where he could grow and have an "exceptional chance at life." L.G.

10

testified that she would "have [her] struggles," but would look for a job, try to get on her feet, and obtain her own vehicle and home.

Beaman, Goss, and the CASA volunteer believed it was in Q.W., III's best interest for L.G.'s parental rights to be terminated. According to Beaman, L.G. did not complete her service plan, did not provide financially for her child, and did not visit him regularly. Nor did she believe that L.G. had addressed her drug issues.

**Conclusion**

Viewing the above evidence relating to the statutory and *Holley* factors in the light most favorable to the trial court's findings, we hold that a reasonable fact finder could have formed a firm belief or conviction that termination of L.G.'s parental rights is in the best interest of the child. *See **In re J.F.C.***, 96 S.W.3d at 266. L.G. argues in her brief, however, that her "relatively stable recent history" should not be overlooked, including numerous negative drug tests and her ability to obtain employment. She also contended that she no longer associated with "questionable" individuals. But this evidence is not so significant that a reasonable trier of fact could not have reconciled this evidence in favor of its finding and formed a firm belief or conviction that termination of L.G.'s parental rights is in the best interest of the child. *See **id.*** Therefore, we hold that the evidence is legally and factually sufficient to support the trial court's finding that termination of L.G.'s parental rights is in the child's best interest. *See* TEX. FAM. CODE ANN. § 161.001(b)(2). Accordingly, we overrule L.G.'s fourth issue.

### DISPOSITION

Having overruled L.G.'s first and fourth issues, we ***affirm*** the trial court's judgment.

JAMES T. WORTHEN
Chief Justice

Opinion delivered March 31, 2017.
*Panel consisted of Worthen, C.J., Hoyle, J., and Neeley, J.*

(PUBLISH)



# COURT OF APPEALS

# TWELFTH COURT OF APPEALS DISTRICT OF TEXAS

# JUDGMENT

**MARCH 31, 2017**

**NO. 12-16-00281-CV**

**IN THE INTEREST OF Q. W., III, A CHILD**

Appeal from the County Court at Law
of Cherokee County, Texas (Tr.Ct.No. 2015-09-0574)

THIS CAUSE came to be heard on the appellate record and briefs filed herein, and the same being considered, it is the opinion of this court that there was no error in the judgment.

It is therefore ORDERED, ADJUDGED and DECREED that the judgment of the court below **be in all things affirmed**, and that this decision be certified to the court below for observance.

James T. Worthen, Chief Justice.
*Panel consisted of Worthen, C.J., Hoyle, J., and Neeley, J.*